Filed 1/29/21  P. v. Mendoza CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> PABLO MENDOZA, JR., <br><br>     Defendant and Appellant. | A157489 <br><br> (Alameda County Super. Ct. No. 17-CR-023555B) |

A jury convicted appellant Pablo Mendoza, Jr. of the first-degree murder of Daniel DelToro and of being a felon in possession of a firearm.  In reaching its verdict, the jury found true several enhancements and special allegations, including that the crime was committed for the benefit of a criminal street gang and that DelToro had been intentionally killed because he was a witness to a crime.  In this appeal, Mendoza challenges his conviction and sentence on the following grounds: (1) that the trial court erred in admitting gang expert testimony about the meaning of certain rap lyrics written by Mendoza prior to the murder; (2) that the prosecutor committed prejudicial misconduct by vouching for witnesses and making other improper arguments; (3) that a probation revocation fine should be stricken because he was sentenced to life without the possibility of parole; and (4) that the trial court improperly imposed several court assessments and

a restitution fine at sentencing without determining his ability to pay. Seeing no error, we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In December 2017, an information was filed by the Alameda County District Attorney, charging Mendoza, Brandon Follings, and Valeria Rose Boden in count one with DelToro's murder. (Pen. Code, § 187.)[1] With regard to count one, the information alleged that both Mendoza and Follings personally and intentionally discharged a firearm which proximately caused great bodily injury and death (§§ 12022.5, subd. (a), 12022.53, subds. (b)-(d), (e)(1) & (g)), doing so for the benefit of a criminal street gang (§ 186.22, subd. (b)(5)), and that the charged murder was a serious felony (§ 1192.7, subd. (c)) and a violent felony (§ 667.5, subd. (c)). The information further alleged a special circumstance that the murder was committed against the witness to a crime. (§ 190.2, subd. (a)(10).) Counts two and three charged Follings and Mendoza, respectively, with possession of a firearm by a felon. (§ 29800, subd. (a)(1).) Mendoza was alleged to have sustained two prior felony convictions. Certain additional enhancements were alleged with respect to Boden and Follings. Prior to trial, Boden's matter was severed from that of Mendoza and Follings.

Jury trial with respect to Mendoza and Follings commenced on April 17, 2019. The following facts were adduced at trial.

### A. Prosecution Evidence

#### i. Kennedy Park Shooting & Prosecution

In 2008, four members of the Decoto XIV (Decoto) gang—Noel Cruz, Raymond Romo, Damien Alaniz, and Joe Perry—attempted a robbery in

---

[1] All statutory references are to the Penal Code unless otherwise specified.

Kennedy Park, an area claimed as Decoto territory in Union City. When the victims resisted, the gang members shot them both, killing one and injuring another. The case remained unsolved for several years.

In 2011, DelToro, a member of the Decoto gang, was arrested for committing an unrelated felony. In response to questioning by Union City detectives, DelToro identified Cruz, Romo, Alaniz, and Perry as the individuals involved in the Kennedy Park incident. The surviving victim corroborated this story by identifying one of the named gang members as one of his assailants. DelToro dropped out of the Decoto gang and testified for the prosecution at the preliminary hearing. Cruz, Alaniz, and Romo all pleaded guilty and were sentenced to lengthy prison terms. Romo received an 11-year sentence for his role in the shooting. Perry proceeded to trial and was convicted as a result of DelToro's trial testimony.

Following the trial, detectives learned that DelToro had been identified on a "bad news list," a hit list of former gang members who had dropped out or "snitched" and were no longer in good standing with the gang. Bad news lists prescribe gang retribution, including beatings, stabbings, and murder. In exchange for cooperating with the Kennedy Park prosecution, DelToro received a reduced sentence of six years, served in local jail to help protect him from possible retaliation.

ii. *Murder of DelToro*

On the afternoon of July 19, 2017, law enforcement officers responded to a 911 call of gunshots in Union City. The officers found DelToro unresponsive and bleeding, with an overturned stroller nearby and a woman holding DelToro's infant son. The woman had run outside after hearing the gunshots to check on the baby. DelToro had suffered six entry gunshot wounds to his chest, back and thighs. He was pronounced dead at the scene.

3

A neighbor testified that she heard gunshots, saw DelToro on the ground, and called 911. Her husband saw a car with a driver and at least two passengers. Another individual wrote a partial license plate number of the vehicle on a trash can nearby. Using surveillance footage and the partial license plate number, sheriff's deputies determined that a vehicle matching the description was registered to Boden's grandmother in Alameda. Boden was arrested and eventually cooperated with the investigation.

Boden testified against Mendoza and Follings at trial pursuant to a plea deal in which she received a six-year prison term in exchange for her truthful testimony. Boden had been romantically involved with Follings in 2017. She owned an illegally purchased firearm, a 9mm Llama, that she gave to Follings about two weeks before the shooting. Follings, a member of the North Side Oakland gang, was friends with Mendoza.

On July 19, 2017, Boden drove her grandmother's Toyota Camry to Mendoza's house at Follings's request. Follings then asked Boden to drive him and Mendoza to buy marijuana at a nearby house. On the way, Mendoza saw DelToro walking down the street pushing his infant son in a stroller. Mendoza became irritated and explained that DelToro was a snitch. Mendoza said he wanted to "fire on" DelToro, which Boden understood to mean he wanted to fight DelToro. Boden said she did not think they should fight him while he was with his baby and Mendoza agreed. She drove them back to Mendoza's house.

After Mendoza exited the car, Follings asked Boden to drive around the block to see where DelToro was going, stating: " 'You're not supposed to ever give a snitch a chance to tell again.' " Boden was afraid but did not refuse because Follings was "not the type of person you say 'no' to." After noting

DelToro's location, Boden drove Follings back to Mendoza's house.[2] Mendoza got back into the vehicle carrying socks and a pair of jeans. Follings repeated that you should "never give[] a snitch a chance to tell again."

According to Boden, as she drove past DelToro, Mendoza told her to stop and began exiting the car. With socks on his hands, Mendoza pointed a gun at DelToro. DelToro stopped pushing the stroller, put his hands in the air, and screamed, " 'My son, my son.' " The gun did not fire, and DelToro fought Mendoza for control of the weapon. Mendoza yelled to Follings: " 'Kill him, kill him.' " Follings got out of the car armed with a gun and fired multiple shots at DelToro. Boden picked up Follings and Mendoza and drove them back to Mendoza's house. Mendoza was bleeding from his arm and accused Follings of shooting him. Follings apologized and said it was not intentional. Boden left the two at Mendoza's house and drove away.

Boden was arrested the night of the murder. Sheriff's deputies located Follings and placed him under arrest on August 4, 2017. Mendoza was arrested on August 17, 2017, when he reported to his probation officer. He had an apparent gunshot wound to his arm. Mendoza's mother was interviewed that day by detectives and reported that Mendoza had told her he and DelToro got into a fight when DelToro tried to take his gun and so Follings shot and killed DelToro. DNA from blood at the crime scene was matched to Mendoza's DNA. The surveillance video obtained by the police was played at trial. The video showed Mendoza with a gun, his struggle with DelToro, and Follings shooting his gun at DelToro.

_____

[2] According to Mendoza's mother, she heard and saw Mendoza and Follings going in and out of her house that day. At one point, she heard them in the backyard whispering: "Fuck that, fuck that." She heard shots some 15-20 minutes later.

5

*iii.*    *Gang Expert Testimony*

Officer Gabriel Urquiza testified as a gang expert concerning the North Side Oakland gang (NSO or Ice City gang) and its subsets, including the Bushrod gang.  He opined that the NSO/Bushrod gang was a criminal street gang and that Follings was a gang member.  Urquiza testified that a music video made of Follings's rap song "On My Job"—in which both Follings and Mendoza appear—announced an alliance between the Ice City and Decoto gangs by spelling out the words "Ice City to Decoto."  In response to a hypothetical in which an NSO gang member and a Decoto gang member form an alliance, then see a snitch on the street and murder that snitch, Urquiza opined that the murder would be committed for the benefit of both gangs because the reputations of both individuals and both gangs would be elevated by their willingness to commit a violent act against the snitch.  Urquiza testified as to certain predicate offenses committed by the NSO gang.

Detective Andrew Gannam testified as a gang expert concerning the Decoto gang.  He described characteristics of the Decoto gang and testified that he had personally obtained DelToro's statement incriminating Decoto gang members in the Kennedy Park shooting.  He opined that Mendoza was a member of the Decoto gang.  Detective Victor Ramirez also testified as a gang expert regarding the composition, characteristics, and activities of the Decoto gang.  Based on his review of the "On My Job" music video, he opined that Mendoza and Follings had formed an alliance and that gang members fortify such alliances by committing crimes.  In response to a hypothetical mirroring the facts of the instant offense, Ramirez opined that both gang members who participate in the murder of a snitch, as well as their respective gangs, would benefit from enhanced reputations for violence.  He also testified about certain predicate offenses committed by the Decoto gang.

**B. Defense Evidence**

Follings testified in his own defense. In 2010, he was convicted of robbery and sentenced to seven years, eight months in prison. Following his release, he experienced some success in his gangster rap career. He met Mendoza through their shared interest in music. Part of his rap music included claiming the neighborhood of Bushrod Park and playing a persona rather than his real self. He denied ever belonging to a gang and stated he had not known Mendoza to associate with Decoto gang members. Follings had never heard of DelToro but when they drove by him on the day of the shooting, Mendoza identified him as a snitch. When they drove by DelToro again, Mendoza pulled a gun. He did not know Mendoza was armed but assumed DelToro was. Boden gave Follings the gun from her purse. He watched Mendoza and DelToro struggle over Mendoza's gun and heard Mendoza say " 'Help, B, help.' " He got out of the car, heard a shot go off, and repeatedly shot DelToro because he "didn't want to get shot."

Mendoza elected not to testify. During closing argument, his defense counsel stressed that Mendoza's gun was never fired. He argued that it was reasonably possible from the evidence presented that Mendoza only wanted to confront, frighten, and fight DelToro, not kill him.

**C. Conviction and Sentence**

On May 9, 2019, the jury found Mendoza and Follings guilty of first-degree murder and possession of a firearm by a felon and found true all related special circumstances, enhancements, and special allegations. On June 6, 2019, Mendoza was sentenced to life in prison without the possibility of parole (LWOP), plus 25 years to life with respect to count one. Certain enhancements related to that count were stayed. As to count two, the court sentenced Mendoza to the upper term of three years, to run concurrently with

the sentence on count one.  The court additionally imposed restitution obligations and various fine, fees, and assessments as discussed further below.  Mendoza's timely notice of appeal followed.

## II. DISCUSSION

### A. Admission of Gang Expert Testimony Regarding Rap Lyrics

#### i. *Additional Background*

Following the conviction of Decoto gang members for their participation in the Kennedy Park shooting, Mendoza, an aspiring rap artist, recorded a song called "100 Bars Part 2."  The lyrics included " '[s]houts out to Lil' Boonge' " and " 'I can't wait until they let you out.' "  The rap lyrics also stated, " 'We gonna find that fuckin' nigga,' " and " 'We gonna air his ass out. Real killas put the barrel in your mouth.' "

Detective Ramirez, who had testified as an expert witness on the structure, territory, and criminal activity of the Decoto criminal street gang, and Mendoza's membership in the Decoto gang, was asked about the song "100 Bars Part 2."  After a recording of the song was played for the jury, the prosecutor asked the detective if a particular verse had any significance to him as a gang expert.

Ramirez began to explain the meaning of certain lyrics to the song. The phrase " 'Shouts out to Lil' Boonge' " referred to Raymond Romo, who was Mendoza's friend and "one of the parties involved in the Kennedy Park homicide."  The second phrase, " 'I can't wait until they let you out,'. " meant that "[o]bviously, Lil' Boonge Romo is in custody right now" and "[l]iterally he can't wait for Romo to get out."  The next three phrases, " 'We gonna find that fuckin' nigga,' " " 'We gonna air his ass out,' " and " 'Real killas put the barrel in your mouth,' " all "refer to Daniel DelToro."  At that point, Mendoza's defense counsel objected and asked for a sidebar.

8

After an unrecorded discussion in chambers, the court summarized the issue before it, stating to the prosecutor "you've highlighted or isolated a particular sequence of lyrics from the video and were about to ask the witness a question about what perhaps in his opinion is the significance of those lyrics." Noting that prior testimony had established that "Lil' Boonge" was "someone who was involved in the Kennedy Park situation" and a "member of Decoto," and the evidence that Mendoza was also a Decoto member, the court concluded that the lyrics at issue "certainly seem to, well, suggest something." Mendoza's counsel objected that the opinion that "those lyrics were referring to Daniel DelToro" was prejudicial because "that's a decision for the jury, the ultimate fact." Counsel emphasized it was just too prejudicial.

The court overruled the objection, stating: "I think that the lyrics are relevant given the testimony that's been adduced. And I think the expert is allowed to give his opinion. [¶] And, [counsel for Mendoza], you can cross-examine and see what—explore perhaps to the extent that you want to. The jury is going to be instructed about their—that they don't have to accept the expert opinions. Obviously they're entitled to weigh them and assess them and in their judgment determine how much weight they should be given. So I think it's a proper subject for the expert to render an opinion on."

Detective Ramirez then gave his opinion about the meaning of the lyrics: "[Mendoza]'s giving a shout out to Raymond Romo, Lil' Boonge. [Mendoza] can't wait for him to get out. And when Lil' Boonge does get out, they're gonna find the victim, Daniel DelToro, and they're going to air his ass out, meaning that they're going to shoot him with a firearm. Bullets . . . create holes." That's where the " 'air out' " reference is. And " 'real killas put the barrel in your mouth.' "

On appeal, Mendoza argues that permitting expert interpretation of the rap lyrics was improper because they were not difficult to decipher and thus the jury was equally competent to understand them. He additionally asserts that the expert testimony amounted to an opinion that Mendoza was guilty, an issue which should have been reserved for the jury. We reject both claims.

*ii. Relevant Law*

While opinion testimony is generally inadmissible (*People v. Torres* (1995) 33 Cal.App.4th 37, 45), a properly qualified expert, with "special knowledge, skill, experience, training [or] education," may provide an opinion at trial. (Evid. Code, § 801, subd. (b).) The subject matter of such an opinion must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*Id.*, subd. (a).)

As our Supreme Court has explained: "The statute does not flatly limit expert opinion testimony to subjects 'beyond common experience'; rather, it limits such testimony to such subjects '*sufficiently* beyond common experience *that the opinion of an expert would assist the trier of fact*' (italics added)." (*People v. McDonald* (1984) 37 Cal.3d 351, 367 (*MacDonald*), overruled on another ground in *People v, Mendoza* (2000) 23 Cal.4th 896, 914.) A jury "need not be wholly ignorant of the subject matter of the opinion in order to justify its admission." (*Ibid.*) Rather, "even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would 'assist' the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that [individuals] of ordinary education could reach a conclusion as intelligently as the witness' [Citation]." (*Ibid.*) We

10

review the decision to admit expert testimony for an abuse of discretion. (*People v, Peterson* (2020) 10 Cal.5th 409, 457.)

Gang evidence " 'is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. [Citations.] . . . [¶] However, gang evidence is inadmissible if introduced only to "show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]" [Citations.] . . . Even if gang evidence is relevant, it may have a highly inflammatory impact on the jury. Thus, "trial courts should carefully scrutinize such evidence before admitting it." ' " (*People v. Coneal* (2019) 41 Cal.App.5th 951, 964 (*Coneal*).) Gang evidence is generally admissible to prove the elements of alleged gang enhancements. (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 (*Vang*); see also *People v. Gutierrez* (2009) 45 Cal.4th 789, 820 (*Gutierrez*). In addition, evidence of gang membership is often relevant and admissible to show motive and intent to commit the charged offense. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*); *People v. McKinnon* (2011) 52 Cal.4th 610, 655.)

Only a few published authorities have dealt with the admissibility of rap lyrics in a criminal trial. In *People v. Olguin* (1994) 31 Cal.App.4th 1355, the trial court properly admitted rap lyrics written by the defendant that demonstrated his membership in a gang, his loyalty to it, his familiarity with gang culture and, inferentially, his motive and intent on the day of the killing. (*Id.* at p. 1372-1373.) In *People v. Zepeda* (2008) 167 Cal.App.4th 25, the appellate court found no abuse of discretion in the admission of rap lyrics written by the defendant where the "lyrics, coupled with the other evidence of defendant's gang membership and his animosity towards [members of the

11

rival gang], go beyond mere fiction to disclosing defendant's state of mind, his motives and intentions, and his fealty to furthering his criminal gang's activities." (*Id.* at p. 35; see also *People v. Johnson* (2019) 32 Cal.App.5th 26, 60-62 [evidence of rap song written by victim admissible as evidence of the defendant's motive to kill the victim].)

Courts have cautioned against a literal reading of rap music lyrics "as statements of fact or actual intent." (*Coneal, supra,* 41 Cal.App.5th at p. 968.) "In general, '[r]easonable persons understand musical lyrics and poetic conventions as the figurative expressions which they are,' which means they 'are not intended to be and should not be read literally on their face, nor judged by a standard of prose oratory.' " (*In re George T.* (2004) 33 Cal.4th 620, 636-637; see also *State v. Skinner* (2014) 218 N.J. 496, 521-522 (*Skinner*) ["One would not presume that Bob Marley, who wrote the well-known song "I Shot the Sheriff," actually shot a sheriff, or that Edgar Allan Poe buried a man beneath his floorboards, as depicted in his short story "The Tell–Tale Heart," simply because of their respective artistic endeavors on those subjects."].)

*iii.   Discussion*

Mendoza first argues that expert interpretation of the rap lyrics at issue was improper because the lyrics were sufficiently clear without the need for expert analysis. Mendoza failed to object in the trial court on this basis and has therefore forfeited the claim. (*Gutierrez, supra,* 45 Cal.4th at p. 819; *People v. Partida* (2005) 37 Cal.4th 428, 431 ["A defendant may not argue on appeal that the court should have excluded the evidence for a reason *not* asserted at trial."].)

Even if Mendoza had properly objected on this ground below, we would find no abuse of discretion on this record. References to "Lil Boonge" and "I

can't wait until they let you out" were sufficiently beyond the jury's common experience as to be incomprehensible without an explanation that "Lil Boonge" was Romo, a member of the Decoto gang who was incarcerated for his participation in the Kennedy Park shooting based on testimony from the victim in this matter. Similarly, the reference to "that fuckin' nigga" was subject to multiple interpretations, a fact Mendoza concedes on appeal. The expert's opinion—based on his knowledge of gang psychology, the structure and activities of the Decoto gang, and the Kennedy Park shooting—provided important context about the rap lyrics in question. His testimony was therefore not inadmissible on the ground that there was no need for expert interpretation.

Citing *People v. Killebrew* (2002) 103 Cal.App.4th 644, Mendoza also contends the expert opinion that the rap lyrics referred to DelToro was in essence improper expert testimony that Mendoza had the specific intent to kill DelToro. Mendoza asserts that it amounted to an opinion that he was guilty, a question solely reserved for the jury. This argument, however, misapprehends both the nature of the rap evidence at issue and the scope of Ramirez's expert opinion.

In *Killebrew*, the appellate court held it was error to admit expert testimony that each of the gang members in a caravan of three cars "(1) knew there was a gun in the Chevrolet and a gun in the Mazda, and (2) jointly possessed the gun with every other person in all three cars for their mutual protection. In other words, [the expert] testified to the subjective *knowledge and intent* of each occupant in each vehicle." (*Id.* at p. 658.) Such opinion testimony was impermissible, and because the expert testimony "was the only evidence offered by the People to establish the elements of the crime," it was the type of improper opinion "that did nothing more than inform the jury

13

how [the expert] believed the case should be decided." (*Ibid.*) Assuming without deciding that *Killibrew* was correctly decided, our Supreme Court has read the case's holding "as merely 'prohibit[ing] an expert from testifying to his or her opinion of the knowledge or intent of a defendant on trial.' " (*People v. Gonzalez* (2006) 38 Cal.4th 932, 946 (*Gonzalez*).)

Here, however, Ramirez never testified that Mendoza had the specific intent to kill DelToro or that Mendoza was guilty of the crimes charged. He simply offered his opinion that the lyrics of Mendoza's rap song could be interpreted to mean that once Romo got out of prison, they would find DelToro and shoot him. At most, then, Ramirez's opinion about the meaning of the lyrics provided some information from which the jury could infer Mendoza's motive and intent with respect to the crimes charged. As discussed above, this was permissible testimony. (See also *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551 ["*Killebrew* does not preclude the prosecution from eliciting expert testimony to provide the jury with information from which the jury may infer the motive for a crime or the perpetrator's intent; *Killebrew* prohibits an expert from testifying to his or her opinion of the knowledge or intent of a defendant on trial."].) *Killibrew* is thus inapposite on this record.

Moreover, precedent regarding the admissibility of rap lyrics in gang cases supports the trial court's decision to admit the expert opinion here. Recently, our colleagues in Division Five considered the admission of several rap music videos featuring the defendant and other members of his gang in *Coneal, supra*, 41 Cal.App.5th 951. The appellate court found the videos cumulative of other gang evidence. (*Id.* at pp. 966-968.) The court also rejected the prosecution's suggestion that the rap lyrics could be construed as literal statements, concluding that "[a]bsent some meaningful method to

14

determine which lyrics represent real versus made up events, or some persuasive basis to construe specific lyrics literally, the probative value of lyrics as evidence of their literal truth is minimal." (*Id*. at p. 968.) Finally, the court found the rap videos highly prejudicial, "casually describ[ing] graphic, widespread violence" and misogyny. (*Id*. at pp. 970-971.) In sum: "[T]he rap videos had minimal probative value, either because they were cumulative of other, less prejudicial evidence, or because their probative value depended on construing the lyrics as literal statements of fact or intent *without a persuasive basis to do so*. This minimal probative value was substantially outweighed by the highly prejudicial nature of the violent, inflammatory lyrics, and the admission of these videos was therefore an abuse of discretion under Evidence Code section 352." (*Id*. at pp. 953-954, italics added.)

In reaching this conclusion, the *Coneal* court was careful to identify situations where rap lyrics might be admissible, stating: "We do not mean to suggest that lyrics are never probative of their literal truth. For example, where lyrics are written within a reasonable period of time before or after the charged crime and bear a sufficient level of similarity to the charged crime, their probative value as a statement of fact is increased." (*Coneal, supra*, 41 Cal.App.5th at p. 969, fn. omitted.) Other courts have reached similar results. (See *Zepeda, supra*, 167 Cal.App.4th at p. 35 [rap lyrics properly admitted because they were not ambiguous or equivocal and were probative of defendant's state of mind, motives and intentions, and gang loyalties]; *Olguin, supra*, 31 Cal.App.4th at p. 1373 [rap lyrics were admissible to demonstrate defendant's gang loyalty and "inferentially, his motive and intent on the day of the killing"].)

15

In the present case, there is a clear nexus between the rap lyrics written by Mendoza prior to DelToro's murder and the circumstances of the charged offenses, and thus a persuasive basis exists for considering them at face value as a reflection of Mendoza's true motive and intent. As the trial court recognized, in light of the corroborating evidence in the case, the lyrics "certainly seem to, well, suggest something." For example, Boden testified that when Mendoza saw DelToro prior to the shooting, he called DelToro a snitch and said he wanted to "fire on" DelToro. She saw Mendoza go into his house and reemerge with socks that she later saw him wearing over his hands while attempting to shoot DelToro, indicating he had already formed the intent to kill DelToro before the shooting. Boden also testified that in the struggle with DelToro, Mendoza shouted, " 'Kill him, kill him.' " Substantial evidence was also admitted of Mendoza's loyalty to the Decoto gang and to Romo himself. Indeed, Mendoza does not challenge on appeal the admission of the rap lyrics themselves. We conclude the trial court did not abuse its discretion in allowing the expert to offer his opinion about the meaning of Mendoza's rap lyrics.[3]

---

[3] We similarly reject Mendoza's constitutional claim. The "routine application of state evidentiary law does not implicate a defendant's constitutional rights." (*People v. Brown* (2003) 31 Cal.4th 518, 545.) " 'The admission of evidence results in a due process violation only if it makes the trial fundamentally unfair. [Citation.] "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." ' " (*Coneal*, *supra*, 41 Cal.App.5th at p. 972.) Here, the record is clear that the gang expert was merely asked his opinion about the meaning of the rap lyrics, and the jury was instructed that they were free to accept or reject that interpretation. We see no error, and certainly no error of a constitutional dimension.

## B. Claims of Prosecutorial Error

### i.  Additional Background

Mendoza contends that the prosecutor erred throughout the trial by vouching for witnesses, injecting his own opinion, and inviting an emotional response from the jury, all amounting to a violation of his due process rights. With respect to the prosecutor's opening statement, Mendoza points to comments that "this case is about the worst gang violence you could ever hear of."  He faults the prosecutor for characterizing the police response as an "incredible investigation" and "[g]ood, hard police work."  He claims it was improper for the prosecutor to indicate that he interviewed Boden twice, at one point telling her:  "You need to be honest.  You can't lie.  You gotta tell me everything.  This is gonna be recorded."  He also contends that the prosecutor narrated what he saw while playing the surveillance video of the homicide in his opening statement, and therefore what the jury should see.

During the trial itself, Mendoza claims that the prosecutor improperly elicited a narration of the homicide video and questioned an officer in a way that indicated the two of them had watched the video together and were consistent in their interpretation of it.  Finally, Mendoza claims the prosecutor erred in his closing argument by stating that "there is an element in our society that's just evil.  That's just bad.  Just doesn't care about life. Doesn't care about other people."  And he challenges the prosecutor's statements that "gang violence is out of control in our society" and that the "gang violence mentality" is to "do what you want whenever you want."

### ii.  The Claims are Forfeited

" 'The standards governing review of misconduct claims are settled.  "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal

17

Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' " ' " (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1266.) " 'Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 835.)

However, "[m]isconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial outcome was affected." (*People v. Shazier* (2014) 60 Cal.4th 109, 127.) Moreover, " 'a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety," where such a request would not have been futile. (*People v. Stanley* (2006) 39 Cal.4th 913, 952; *People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).) " ' "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.' " ' " (*People v. Williams* (2017) 7 Cal.App.5th 644, 682 (*Williams*).)

It is " ' "improper to make arguments to the jury that give it the impression that 'emotion may reign over reason,' and to present 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response.' " ' " (*People v. Vance* (2010) 188 Cal.App.4th 1182, 1192.) A prosecutor should also avoid improper vouching—" ' "an attempt to bolster a witness by reference to facts outside the record." ' " (*People v. Huggins* (2006) 38 Cal.4th 175, 206.) "Nor

may prosecutors offer their personal opinions when they are based solely on their experience or on other facts outside the record." (*Id.* at p. 207.)

Advocates, however, "are given significant leeway in discussing the legal and factual merits of a case during argument." (*People v. Centeno* (2014) 60 Cal.4th 659, 666.) " ' " 'The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*Hill, supra,* 17 Cal.4th at p. 819.) When a claim of misconduct "focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

We need not determine whether the prosecutor's conduct rose to the level of misconduct under the standards here articulated because, as Mendoza acknowledges, defense counsel did not object to the prosecutor's lines of questioning or his opening or closing argument.[4] Further, nothing in this record indicates an objection would have been futile or that curative action would have been ineffective, and Mendoza does not argue otherwise. We thus conclude that Mendoza has forfeited his claims of misconduct.

Mendoza suggests that we exercise our discretion to nevertheless reach the merits of his misconduct arguments. (See *People v. Williams* (1998) 17

---

[4] Mendoza asserts that there was a defense objection to the prosecutor's reference to Boden during opening argument. However, the objection was on grounds of argument, not vouching, and was made by Follings's counsel, not Mendoza's. It was therefore insufficient to preserve Mendoza's vouching claim. (*People v. Wilson* (2008) 44 Cal.4th 758, 793 [defendant's failure to affirmatively join a codefendant's motion forfeits the issue on appeal]; *People v. Ashmus* (1991) 54 Cal.3d 932, 976 [objection without an assignment of misconduct insufficient to preserve issue], limited on an unrelated point as stated in *People v. Yeoman* (2003) 31 Cal.4th 93, 117.)

Cal.4th 148, 161-162, fn. 6 ["an appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party"].) We decline to do so. Deciding whether to object is inherently tactical. (*Williams*, *supra*, 7 Cal.App.5th at p. 686; see also *People v. Riel* (2000) 22 Cal.4th 1153, 1197 ["competent counsel may often choose to forego even a valid objection."].) Here, in his own closing argument, Mendoza's defense counsel began by stating: "I also sort of want to start off with the elephant in the room. The prosecutor has presented a case that has an awful lot of emotion in it. It's a lot of gang tattoos. It's a lot of crimes that aren't necessarily associated with this particular act, but they were brought in to show that there was some type of gang enhancement, some type of gang affiliation." Counsel then encouraged the jury to make a decision "based on the evidence. The evidence, not the emotion, not the tattoos, not the predicate stuff, not the baby in the baby carriage." As for Boden's credibility, defense counsel opined: "She's got a heavy bias. She's a witness that's in custody that was charged with murder that was looking at a substantial penalty. And she's getting six years from the prosecutor who had to interview her twice in order to feel comfortable that she was saying something close to the truth." Defense counsel thus appears to have made a tactical decision to forego any possible objection to the prosecutor's arguments in favor of reasoned argument.

As for Mendoza's assertion that the prosecutor improperly inserted his own opinion into the proceedings by narrating and eliciting narration of the events depicted by the surveillance video, this is precisely the type of situation that could have been remedied by an early objection, giving the trial court the opportunity to avert any misunderstanding the prosecutor's comments might have caused. (*Williams*, *supra*, 7 Cal.App.5th at p. 686; see

20

also *People v. Taylor* (1982) 31 Cal.3d 488, 496 ["A timely objection allows the court to remedy the situation before any prejudice accrues."].) Moreover, it again appears that defense counsel did not lodge such an objection in the case because he chose to deal with the video issue in his own closing argument. Defense counsel stated: "I'm not going to play the video. . . . I believe that the video speaks for itself. [¶] I've been doing this for awhile, and I know what's going to happen. You guys are going to look at the video over and over. And the 12 of you are going to go over it and somebody's going to have a different impression. . . . [¶] I'm a sport's fan. . . . I'm going to watch the Warriors tonight. And no doubt somebody is going to commit a foul. . . . And they're going to show the replay and it will look like a foul, but if you're a Warriors fan you're going to say, No, it wasn't a foul. . . . [¶] When you look at this video, you're going to be able to slow it down. You're going to be able to go through it. I'm going to trust your judgment." It appears that counsel made a tactical decision to counteract the prosecutor's comments by his reference to "home team" bias and by urging the jury to decide the evidentiary issue for themselves. Under these circumstances, we decline to reach the merits of Mendoza's misconduct claims.[5]

## C. Parole Revocation Fine Was Properly Imposed

The minute order for Mendoza's June 2019 sentencing hearing states that "[d]efendant is to pay a Restitution Fine of $10,000.00 (Penal Code Section 1202.4(b)) and an additional Parole Restitution [sic] Fine of $10,000 (Penal Code Section 1202.45) is suspended pending successful completion of

_____

[5] Mendoza asks that we consider cumulative prejudice in viewing the impact of the alleged trial errors he has asserted on appeal. However, since we have identified no errors in the proceedings below, there is nothing here to cumulate. (See *People v. Griffin* (2004) 33 Cal.4th 536, 600, disapproved on another ground as stated in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.)

parole." The Abstract of Judgment similarly lists a $10,000 fine "per PC 1202.45 suspended unless parole is revoked." Mendoza argues that, because he was sentenced to an LWOP term, the trial court's imposition of the parole revocation fine amounts to an unauthorized sentence and must be vacated on appeal, even if it was not preserved in the trial court. (See *People v. Scott* (1994) 9 Cal.4th 331, 354.) We disagree.

Pursuant to section 1202.45, "[i]n every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall . . . assess an additional parole revocation restitution fine." (*Id.*, subd. (a).) The fine is suspended unless and until parole is revoked. (*Id.*, subd. (c).) While Mendoza is generally correct that a trial court cannot impose the parole revocation fine on an LWOP term (see *People v. McWhorter* (2009) 47 Cal.4th 318, 380; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183 (*Oganesyan*).), the court must do so if a defendant's sentence, as here, also includes a determinate prison term under section 1170. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075 (*Brasure*) [distinguishing *Oganesyan* and upholding a parole revocation fine where the court imposed a determinate sentence, in addition to the defendant's death sentence].) Imposition of the fine is required by law even if the defendant "is unlikely ever to serve any part of the parole period on his determinate sentence." (*Ibid.*)

In addition to Mendoza's LWOP sentence, the trial court imposed an unstayed determinate three-year term for possessing a firearm as a felon, to run concurrently. Accordingly, the trial court properly imposed and stayed the parole revocation fine. (*Brasure, supra*, 42 Cal.4th at p. 1075.) As noted in *Brasure*, a "[d]efendant is in no way prejudiced by assessment of the fine,

which will become payable only if he actually does begin serving a period of parole and his parole is revoked." (*Ibid.*)

Mendoza's suggestion that a distinction should be made between concurrent and consecutive determinate sentences when considering imposition of a parole revocation fine is not well taken. *Brasure* made no such distinction and distinguished *Oganesyan* as involving no determinate term of imprisonment under section 1170. (*Ibid.*) When a determinate term is imposed—whether consecutively or concurrently—failure to impose a parole revocation fine would be contrary to the plain language of the relevant statutes. (See § 1202.45 ["[i]n every case where a person is convicted of a crime and his or her sentence *includes a period of parole*, the court *shall . . . assess* an additional parole revocation restitution fine," italics added]; § 3000, subd. (a)(1) [a determinate prison term under section 1170 "*shall include* a period of parole," italics added].)

Mendoza's alternate argument is equally unavailing. Although Mendoza concedes that the minute order in this case "states definitively that the parole revocation fine was imposed," he asserts that the trial court's oral pronouncement indicates the parole revocation fine was not imposed. Arguing that the statement in the reporter's transcript should control over the minute order, he requests that the minute order be corrected to strike the parole revocation fine. A record that is in conflict must be harmonized to the extent possible. " '[W]hether the recitals in the clerk's minutes should prevail as against contrary statements in the reporter's transcript, must depend upon the circumstances of each particular case.' " (*People v. Smith* (1983) 33 Cal.3d 596, 599.)

Mendoza points to the following statement by the trial court at the sentencing hearing: "I will not address a parole revocation fine because I

23

don't think that would be relevant. Should it in some event, at some point, in some way or somehow become relevant, a parole revocation fine in the same amount will be imposed, but stayed, pending successful completion of parole." This statement is, at best, ambiguous. It can be read to mean that the trial court would not address the parole revocation fine in any detail as it was unlikely ever to be relevant, but that the fine nevertheless would be imposed and stayed in case it somehow did become relevant. Given the ambiguity in the recorder's transcript, and the court's statutory obligation to impose the parole revocation fine under these circumstances, we harmonize the record to support the imposition of the fine.

### D. Mendoza Has Forfeited His *Dueñas* Challenges

At sentencing, the trial court ordered Mendoza to pay certain fines, fees, and assessments, including a $60 court facilities assessment (Gov. Code, § 70373); an $80 court operations assessment (§ 1465.8); and a $10,000 restitution fine (§ 1202.4, subd. (b)). Relying on *People v Dueñas*, (2019) 30 Cal.App.5th 1157 (*Dueñas*), Mendoza argues that the trial court erred by imposing the restitution fine and court assessments without determining his ability to pay. We decline to reach these forfeited claims.[6]

With respect to the restitution fine, section 1202.4 requires the imposition of a such a fine upon conviction of a crime, unless the court "finds compelling and extraordinary reasons for not doing so." (§ 1202.4, subd. (b).) The minimum restitution fine for felony convictions is $300, and the

---

[6] In *Dueñas, supra*, 30 Cal.App.5th 1157, the Court of Appeal for the Second District, Division Seven, held that imposing assessments and a fine on an indigent defendant violated due process-based rights that ensure access to the courts and bar incarceration based on nonpayment of fines due to indigence. (*Id*. at pp. 1167–1168, 1172.) The issues raised in *Dueñas* are currently before the California Supreme Court. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

maximum fine is $10,000. (*Id.*, subd. (b)(1).) The statute expressly provides that "[a] defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine." (*Id.*, subd. (c).) However, "[i]nability to pay may be considered . . . in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b)." (*Ibid.*) The burden of demonstrating such inability to pay lies with the defendant. (*Id.*, subd. (d); see also *People v. Castellano* (2019) 33 Cal.App.5th 485, 490 ["Consistent with *Dueñas*, a defendant must in the first instance contest in the trial court his or her ability to pay."].)

Here, Mendoza concedes he did not object to imposition of the maximum restitution fine. *Dueñas* was decided in January 2019, five months prior to Mendoza's sentencing hearing, and it is unclear whether defense counsel was aware of the decision. However, even prior to *Dueñas*, an objection to a maximum restitution fine clearly would not have been futile as trial courts are statutorily authorized to consider a defendant's inability to pay any restitution fine above the statutory minimum. (§ 1202.4, subds. (c) & (d).) Accordingly, we conclude that Mendoza forfeited his *Dueñas* challenge to the restitution fine under basic forfeiture principles. (See *People v. Smith* (2020) 46 Cal.App.5th 375, 395 (*Smith*) [finding failure to object to imposition of the maximum restitution fine "inexcusable" on this basis]; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 (*Gutierrez*) [ability-to-pay challenge forfeited, noting that "even before *Dueñas* a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay"]; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154 (*Frandsen*) [same].)

Moreover, several courts have held that, where a defendant does not object to imposition of the maximum restitution fine on grounds of inability to

25

pay, such failure also forfeits claims of inability to pay "much smaller" criminal assessments. (*Smith*, *supra*, 46 Cal.App.5th at p. 395; see also *Gutierrez*, 35 Cal.App.5th at p. 1033 ["As a practical matter, if Gutierrez chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees."]; *Frandsen*, *supra*, 33 Cal.App.5th at p. 1154 [same].) Unlike the *Duenas* defendant, Mendoza had a statutory right to an ability-to-pay hearing that he did not exercise, thus forfeiting his appellate claim that such a hearing was required. The same evidence in the hearing that would have addressed Mendoza's ability to pay the $10,000 restitution fine, could have also established his inability to pay these smaller assessments. We thus conclude that Mendoza has also forfeited any challenge to the court facilities and court operations assessments.

Finally, we reject Mendoza's suggestion that defense counsel was ineffective for failing to object to imposition of the court assessments and restitution fine at issue. Where, as here, "counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.) Mendoza was 27 years old when sentenced to LWOP. He was working to obtain his GED while in custody. He had been employed as a certified forklift driver and had been providing in-home relative care for $17 per hour. He reported no disabilities. Under these circumstances, it is conceivable that counsel did not object to imposition of the court assessments and restitution fine because Mendoza had the ability to pay them. Mendoza is thus unable to sustain a claim of ineffective assistance.

## III.   DISPOSITION

The judgment is affirmed.

_____

SANCHEZ, J.

We concur.

_____

HUMES, P.J.

_____

BANKE, J.

(A157489)